## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THOMAS S. NEUBERGER; JERRY L.          :
MARTIN; WILLIAM R. HAGUE, JR.;         :
BRUCE C. SMITH; BRIDGEVILLE            :
KENPO KARATE, INC. d/b/a BKK           :
FIREARMS; DELAWARE STATE               :
SPORTSMEN'S ASSOCIATION, INC;          :
and BRIDGEVILLE RIFLE & PISTOL         :
CLUB, LTD.,                            :
                                       :
      Plaintiffs.                :
                                       :
   v.                               : Civil Action No. _____
                                       :
JOSHUA BUSHWELLER, in his              :
official capacity as Cabinet Secretary, :
Delaware Department of Safety and      :
Homeland Security; and COL. WILLIAM    :
CROTTY, in his official capacity as     :
superintendent of the Delaware State Police, :
                                       :
      Defendants.                :

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs,[1] by counsel, bring this Complaint against Defendants,[2] all of whom

are Delaware state officials responsible for enforcing and implementing Delaware's

---

[1] Thomas S. Neuberger; Jerry L. Martin; William R. Hague, Jr.; Bruce C. Smith; Bridgeville Kenpo Karate, Inc., doing business as BKK Firearms (BKK); Delaware State Sportsmen's Association (DSSA); and Bridgeville Rifle and Pistol Club, Ltd. (BRPC) (collectively, "Plaintiffs").

[2] Secretary Joshua Bushweller, Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. William Crotty, as the top law enforcement officer at the Delaware State Police.

laws and regulations—including those that infringe the Second Amendment's right of law-abiding citizens to keep and bear commonly possessed firearms for self-defense, and for other lawful purposes, which is the core of this lawsuit. By its Complaint, Plaintiffs seek the Court's assistance in protecting their Second, Fourth, and Fourteenth Amendment rights and their ability to defend themselves, their family, and their homes by declaring Delaware's overreaching "Permit-to-Purchase" handgun regulation unconstitutional, and preliminarily and permanently enjoining its implementation and enforcement. Absent such relief by the Court, Delaware's "Permit to Purchase" regulation will begin to be enforced on November 16, 2025,[3] just days from now, causing an immediate and irreparable deprivation of Plaintiffs' constitutional rights.

## INTRODUCTION

1.    The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST., amend. II. The United

---

[3] Section 5 of the "Permit-to-Purchase" Bill provides that it is to be implemented the earlier of the following:  "(1) Eighteen months from the date of the Act's enactment [or] (2) The date of publication in the Register of Regulation of a notice by the Director of the State Bureau of Identification that the necessary processes have been established for implementation of the handgun qualified purchaser permit under Section 1 of this Act. Governor Carney signed the Permit to Purchase statute into law on May 16, 2024, and to Plaintiffs' knowledge, there has been no notice by the Director that the necessary processes have been established for implementation. Accordingly, the Permit to Purchase statute will be implemented on November 16, 2025, 18 months from the date of enactment.

States Supreme Court has ruled that the Second Amendment protects the fundamental right to self-defense inside and outside the home. *District of Columbia v. Heller,* 544 U.S. 570, 635 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022).

2.    In defiance of this established and unassailable authority, the State of Delaware enacted into law Senate Substitute 1 for Senate Bill 2 ("SS 1 for SB 2" or "Permit-to-Purchase Bill"), which flouts Delawareans' fundamental civil rights by imposing an ahistorical and burdensome permitting scheme for acquisition of a handgun for self-defense and other lawful purposes.[4] SS 1 for SB 2 also criminalizes handgun acquisition without a Permit-to-Purchase. A copy of SS 1 for SB 2 is attached as Exhibit A.

3.    Further, if one's handgun permit is revoked for any reason, the State Police and/or local police shall, according to the Permit-to-Purchase Bill, purportedly have "probable cause" to effect the "surrender" or removal of the handguns from the individuals' home,[5] which is a violation of not only the Second

---

[4] SS 1 for SB 2 requires a Delaware citizen to obtain a handgun qualified purchasing permit prior to purchasing a handgun, but not other firearms. *See* 11 *Del. C*. § 1448D. SS 1 for SB 2 defines a "handgun" include "a pistol, revolver, or other firearm designed to be readily capable of being fired when held in 1 hand."  § 1448D(a)(2).

[5] Former Secretary of Delaware Department of Safety and Homeland Security Nathanial McQueen testified on the record before the Legislature during debate on SS 1 for SB 2 that all firearms in the home would be removed even if the permit infraction only applied to one firearm.

Amendment, but also the Fourth Amendment protection against unreasonable searches and seizures.

4.      Defendants' enforcement of SS 1 for SB 2 inflicts irreparable harm upon the Plaintiffs, law-abiding citizens or organizations whose members are such citizens, who simply want to purchase (or sell) a handgun for self-defense and other lawful purposes, by unlawfully restricting their fundamental rights, including the right to keep and bear arms to protect them and their families as guaranteed by the Second and Fourteenth Amendments to the United States Constitution.

5.      Additional irreparable harm to Plaintiffs will be inflicted upon Plaintiffs when SS 1 for SB 2 begins to be enforced on November 16, 2025.  This is because of the State's failure to put in place complete procedures for obtaining the required handgun qualified purchaser permit. As a result, Plaintiffs will be unable to obtain the required permit by the date SS 1 for SB 2 is to be enforced, and there is nothing to ensure they will be able to obtain the required permit thereafter. Accordingly, enforcement of SS 1 for SB 2 effectively results in an immediate and unconstitutional handgun ban. Therefore, and concurrently herewith, Plaintiffs are moving for expedited injunctive relief to enjoin the imminent enforcement of SS 1 for SB 2.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction over the claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201 and 2202; 42 U.S.C. §§ 1983 and 1988; as well as the U.S. Constitution's Second, Fourth, and Fourteenth Amendments. Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

7.     Plaintiff Thomas S. Neuberger is a natural person and a citizen of the United States and the State of Delaware.

8.     Neuberger is 78 years old, an attorney licensed to practice law in the State of Delaware, a 2023 recipient of the Leonard L. Williams Criminal Justice Reform Award from the Wilmington NAACP, Life Member of the NAACP, and a resident of New Castle County, Delaware, since 1947. He has a history of rifle shooting and won merit badges for shooting while a Boy Scout at St. Anthony of Padua Grade School in Wilmington, Delaware. He is a member of DSSA and BRPC.

9.     Neuberger does not presently own a handgun.

10.     For reasons including his age, area criminal statistics, and general civil unrest in this Country, Neuberger has legitimate, ongoing concerns for his and his family's safety. Neuberger, in the past, also has been threatened with physical harm due to his pro bono civil rights work.  Today, with the social fabric unraveling in the

Country, his fears of violence are even greater. He remembers when Dr. Martin Luther King's family and home were first bombed in Alabama in 1956 and Dr. King sought to obtain a handgun to protect his family. But Alabama had a handgun permit law then, and the Governor refused to give him a permit for a handgun. Neuberger does not want any law–abiding Delawarean to find themselves in a similar situation.

11.     Neuberger has received self-defense and firearms safety training from a retired State Trooper who previously commanded the Delaware State Police firearms range and who trained State Troopers in gun safety. Neuberger considered purchasing a handgun at that time and discussed it with the State Trooper who provided him with recommendations for his self-defense. Based on these recommendations, Neuberger decided that he needs a handgun for self-defense and decided that the Sig Sauer P365 is the best option. Neuberger intends to make such a purchase on November 28, 2025, when he expects prices to be most favorable. Such a purchase, however, will be restricted by SS 1 for SB 2's burdensome handgun permitting scheme that will be enforced no later than November 16, 2025.

12.     Having to endure the burdensome and unconstitutional permitting process, which is lengthy and arduous with 11 elements and is discretionary—before being able to purchase a handgun for his and his family's self-defense, constitutes sufficient harm for Neuberger to bring this lawsuit. Further, although Neuberger believes he should not have to go through the permitting process, even if he were to

do so, he would be unable to obtain a permit because the necessary infrastructure to do so is not fully in place. Therefore, Neuberger will be effectively prohibited from purchasing a handgun beginning on November 16, 2025.

13. As a practicing civil rights attorney, Neuberger also cannot risk being prosecuted if he were to violate SS 1 for SB 2, as that would impact his ability to practice law and provide legal services to those underserved individuals he seeks to represent.

14. Accordingly, Neuberger's immediate deprivation of his constitutional rights on November 16, 2025, regarding his inability to purchase a handgun for self-defense and other lawful purposes as alleged herein, constitutes harm that is both "concrete and particularized" and "imminent, not conjectural or hypothetical," which renders Neuberger an aggrieved party and a proper plaintiff. *See Lujan v. Defenders of Wildlife*, 505 U.S. 555, 564 (1992) (a "description of concrete plans" satisfies the imminency requirement for standing).

15. Jerry L. Martin is the President of the Bridgeville Rifle and Pistol Club, Ltd. Additionally, he is a member of the DSSA.

16. Martin competes in Cowboy Action, a competitive shooting sport. He regularly purchases and collects firearms and will continue that practice in the future.

17. Martin intends to purchase a handgun restricted by SS 1 for SB 2's permit requirement. Specifically, he intends to purchase a Sig Sauer P365 on

166398698.1

November 28, 2025, when he expects the price to be most favorable. At that time, SS 1 for SB 2 will necessarily be subject to enforcement.

18.     Martin needs a handgun for competition shooting, self-defense and other legitimate activities and will not be able to timely obtain one because of, among other things, SS 1 for SB 2's lengthy and arduous 11-point process and discretionary approval by a government official.

19.     While the harm to Martin described above is sufficient for him to bring this case, there is more. Although Martin, like Neuberger, believes he should not have to go through the permitting process, even if he were to do so, he would be unable to obtain a permit because the necessary infrastructure to do so is not fully in place. Accordingly, Martin will be effectively barred from purchasing a handgun on November 16, 2025.

20.     Accordingly, Martin's immediate deprivation of his constitutional rights on November 16, 2025, regarding his inability to purchase a handgun for self-defense and other legitimate purposes as alleged herein, constitutes harm that is both "concrete and particularized" and "imminent, not conjectural or hypothetical," which makes Martin an aggrieved party and a proper plaintiff.

21.     William R. Hague, Jr., is a 19-year-old Delawarean.

22.     Hague is a member of BRPC and DSSA.

23.     Delaware's prohibition under on adults between the ages of eighteen and twenty-one from purchasing, or otherwise obtaining, any firearm that falls outside the definition of "shotgun" or "muzzle-loading rifle" has recently been held to violate the Delaware Constitution and is unenforceable. *See Birney v. Del. Dep't of Safety & Homeland Sec.*, 2025 WL 2836751 (Del. Super. Ct. Oct. 2, 2025).

24.     As a result, Hague intends to purchase a handgun for self-defense and other lawful purposes on November 28, 2025, when he too expects the price to be most favorable.

25.     At that time, however, SS 1 for SB 2 will be subject to enforcement and Hague will need to have a handgun qualified purchasing permit to make such a purchase.  As a result, Hague, like Neuberger and Martin, will have to undergo SS 1 for SB 2's unconstitutional lengthy, arduous and discretionary permitting process to be able to purchase a handgun.

26.     And like Neuberger and Martin, the harm to Hague is aggravated because the State has not fully established the necessary infrastructure for implementation of SS 1 for SB 2. As a result, even if Hague engaged in the permit process, something he believes is unconstitutional, he would be unable to obtain the required permit.  Therefore, he will be banned from purchasing a handgun on November 16, 2025.

166398698.1

27. In addition to the foregoing, Hague faces yet another insurmountable hurdle. Under SS1 for SB 2, Hague will not be able to obtain the necessary permit to purchase a handgun until he reaches 21 years of age on May 15, 2027. This is because SS 1 for SB 2's unconstitutional framework provides that the required permit may not be issued to "[a] person under the age of 21." *See* 11 *Del. C.* § 1448D(f)(1).

28. Hague's immediate deprivation of his constitutional rights on November 16, 2025, regarding his inability to purchase a handgun for self-defense and other lawful purposes as alleged herein, constitutes harm that is both "concrete and particularized" and "imminent, not conjectural or hypothetical," which makes Hague an aggrieved party and a proper plaintiff.

29. Plaintiff BKK is a business headquartered in the State of Delaware and duly authorized to do business in the State.

30. Plaintiff Bruce Smith is the owner of BKK and a citizen of the United States and of the State of Delaware.

31. Smith is a member of the DSSA and BRPC.

32. BKK is a federally-licensed firearms dealer in good standing and is in the business of lawfully and responsibly selling firearms throughout Delaware.

33. When SS 1 for SB 2 is implemented in only a few days from now, BKK will not be able to lawfully sell handguns to Delaware residents without the required

permit.  As a result, the constitutional rights of BKK and its owner, Smith, will be violated, in that the Second Amendment includes the right to sell firearms to give effect to the right to own, keep and bear them. Long-settled precedent holds that a state may not suppress fundamental rights by attacking the means by which they are exercised. *See Heller*, 554 U.S. at 617-18 (discussing the implicit right to train with weapons) (citing T. Cooley, General Principles of Constitutional Law 271 (2d ed. 1891); *United States v. Miller*, 307 U.S. 174, 180 (1939) (citing 1 H. Osgood, The American Colonies in the 17th Century 499  (1904) (discussing the implicit right to possess ammunition)); Drummond, 9 F.4th at 227 (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)) ("This 'implies a corresponding right to acquire and maintain proficiency' with common weapons."); *see also McConnell v. Federal Election Comm'n*, 540 U.S. 93, 252, (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part) (The First Amendment "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.").

34.    Compounding the harm, because the full permit infrastructure is not in place, no one has been able to obtain the required permit, and, therefore, no one will be able to buy a handgun under the SS 1 for SB 2 scheme on November 16, 2025. It is also unknown when or whether the full infrastructure for SS1 for SB 2 will be

in place. As a result, BKK will suffer a significant reduction in its business and will not be able to stay in business, constituting additional harm to it and its owner, Smith.

35.     Further, SS 1 for SB 2 provides for criminal prosecution of Smith should he violate it by selling or delivering a handgun to a person without a permit. "A transferor who willfully and intentionally sells or delivers a firearm in violation of this section is guilty of a class A misdemeanor." *See* 11 *Del. C.* § 1448A(h).  A second or subsequent offense by an individual is a class G felony." *See id.* A transferor is defined to mean "…a licensed dealer, licensed manufacturer, or licensed importer, or an employee thereof, or any other person who sells, transfers or delivers a firearm." *See* 11 *Del. C.* § 1448A(a)(3)(b).

36.     Accordingly, if the implementation of the Permit Bill is allowed to go forward on November 16th, BKK and Smith will be left with two choices: (i) immediately stop selling handguns and go out of business; or (ii) keep selling handguns and be subject to significant criminal liability.

37.     The resulting harm to BKK and Smith described above is both "concrete and particularized" and "imminent, not conjectural or hypothetical," and therefore BKK and Smith are aggrieved parties and proper plaintiffs.

38.     The Delaware State Sportsmen's Association (DSSA) was founded in 1968 as the official state-level affiliate of the National Rifle Association of America,

and its membership currently consists of approximately 4,500 individual members
and constituent clubs.

39.    Bridgeville Rifle and Pistol Club, Ltd (BRPC) was formed in the early
1950's by a group of veterans returning from World War II and the Korean Conflict
for the purpose of establishing and providing a venue where its members and their
guests might lawfully and safely exercise their right to keep and bear arms for lawful
purposes. BRPC membership currently stands at approximately 1,600 individual
members and their families.BRPC serves as a competitive shooting club that
conducts education, training, and competitive shooting events drawing competitors
and participants from throughout the United States.

40.    DSSA and BRPC[6] are organizations whose members will be subjected
to the Permit-to-Purchase requirement. "An association has standing to bring suit on
behalf of its members when its members would otherwise have standing to sue in

---

[6] DSSA and BRPC, along with undersigned lead counsel, have successfully
vindicated their members' and similarly situated Delawareans' right to keep and bear
arms in all four final decisions challenging the governmental attempts in Delaware
to restrict those rights. *See Doe  v. Wilmington Housing Authority*, 88 A.3d 654 (Del.
2014); *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017);
*Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. Ct. 2018);
*Del. State Sportsmen's Ass'n v. Garvin,* 2020 LEXIS 2927 (Del. Super. Ct. Nov. 18,
2020). Standing was not defeated in any of those challenges. DSSA and BRPC have
prevailed when the final appeals were decided on the merits, or the state did not
appeal a win, in every challenge of State law based on the right to keep and bear
arms.

166398698.1

their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). The individual members of DSSA and BRPC would have standing to bring suit in their own right as individuals who desire to purchase common arms subjected to SS 1 for SB 2, challenging SS 1 for SB 2 is germane to DSSA and BRPC's respective purposes of promoting the safe and lawful exercise of their members' rights to use common arms, including the handguns subjected to SS 1 for SB 2.

41.    Organizational plaintiffs must "identify members who have suffered requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  Here, Neuberger, Martin, Hague, and Smith are all members of DSSA and BRPC and subject to the requirements of SS 1 for SB 2.

42.    Other members of DSSA and BRPC have many of the same fears as Neuberger, Martin, Hague, and Smith. Many of their members are like Neuberger, Martin, and Hague, and are subjected to the same lengthy, arduous, and arbitrary 11-point process, age requirement, and the discretionary approval of a government

official required[7] to purchase and possess a handgun—the "quintessential self-defense weapon *Heller*, 554 U.S. at 629. SS 1 for SB 2 leaves these members vulnerable to attack without the ability to defend themselves and their families.

43.    Other members of DSSA and BRPC are federally-licensed firearms dealers or employees of federally-licensed firearms dealers, the same as BKK and Smith, that are subjected to (a) loss of business due to not being able to sell handguns and (b) criminal liability should they sell a handgun to someone without the permit required under SS 1 for SB 2.

44.    Plaintiffs—Neuberger, Martin, and Hague, and other members of DSSA and BRPC—have concrete plans to purchase a handgun covered by SS 1 for SB 2's permit requirement.

45.    But SS 1 for SB 2 vests unbridled discretion in the Director to deny their permit application and, thus, denies them their fundamental rights codified by the Second Amendment. *See Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750 (1988) (citing cases establishing "that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny

---

[7] §1448(f)(3) provides the following discretionary and ambiguous standard: "…the Director may not issue a handgun qualified purchaser permit to…a person who poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms."

expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.").

46.     The harm to DSSA and BRPC, and its members, as described above is both "concrete and particularized" and "imminent, not conjectural or hypothetical," and therefore DSSA and BRPC are aggrieved parties and proper plaintiffs.

47.     Defendant Joshua Bushweller is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security. This suit is brought against Defendant Bushweller in his official capacity as Cabinet Secretary. In such capacity, Defendant Bushweller oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Permit-to-Purchase requirement. Defendant Bushweller's enforcement of the Permit-to-Purchase Bill's ban on purchase or possession without a handgun Permit-to-Purchase license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase Bill, which leaves them unable to keep constitutionally protected handguns.

48.     Defendant Col. William Crotty is the Superintendent of the Delaware State Police. This suit is brought against Defendant Crotty in his official capacity as Superintendent of the Delaware State Police. In such capacity, Defendant Crotty executes and administers the State's laws, including the Permit-to-Purchase Bill. Defendant Crotty's enforcement of the Permit-to-Purchase Bill's ban on purchase or

possession without a handgun Permit-to-Purchase license places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Permit-to-Purchase Bill, which leaves them unable to keep constitutionally protected handguns.

49.     Plaintiffs, as firearms purchasers and sellers subject to SS 1 for SB 2's requirements, are "object[s] of the action" of the law, in which case "there is ordinarily little question that the action or inaction has caused him injury." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 362 (3d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 61–62 (1992)).  Defendants' implementation (or lack thereof) and enforcement of SS 1 for SB 2 inflict harm upon Plaintiffs by unlawfully restricting and outright banning their fundamental right to keep and bear arms in common use for self-defense and other lawful purposes, as guaranteed by the Second and Fourteenth Amendments to the United States Constitution.

## FACTUAL ALLEGATIONS

## I.     DELAWARE'S UNCONSTITUTIONAL SS 1 FOR SB 2

50.     SS 1 for SB 2 was signed into law on May 16, 2024. It bans the purchases of handguns for self-defense and other lawful purposes by law-abiding citizens without a permit. *See* 11 *Del. C.* §1448D (Restricting the sale, purchase, or transfer of handguns only to those who undertake the rigorous licensing

166398698.1

17

requirements to exercise a constitutional right.).[8] Accordingly, SS 1 for SB 2 deprives hundreds of thousands of Delaware residents—including Plaintiffs, their members, and others similarly situated—of their fundamental, individual right to keep and bear common arms through its arduous and discretionary Permit-to-Purchase scheme.

51.    SS 1 for SB 2 also criminalizes constitutionally protected activity. Among other things, SS 1 for SB 2 purports to authorize the Delaware State Police or a local law-enforcement agency to "take action to ensure surrender or removal" of *any* handguns possessed by any law-abiding Delawarean whose permit is revoked, regardless of the reason. *See* 11 *Del. C*. § 1448D(l)(3). SS 1 for SB 2 also provides for criminal prosecution of "transferors" that sell or deliver a handgun to a person without a permit. § 1448A(h).

52.    Accordingly, Plaintiffs will be subjected to enforcement of SS 1 for SB 2 because they either intend to imminently purchase a handgun covered by SS 1 for SB 2 or may sell a handgun to someone without the required permit. Therefore, SS 1 for SB 2 leaves Plaintiffs with a Hobson's choice—(1) subject themselves to a lengthy and arduous 11-point process and the unbridled discretion of the Director in order to exercise their fundamental Second Amendment rights and apply for a

_____

[8] As an analogy, consider the constitutionality of a statute that would require a citizen to obtain a permit before exercising her fundamental First Amendment right to exercise freedom of speech or to exercise her freedom of religion.

permit; (2) decline to purchase a permit-less handgun out of fear of prosecution, including a warrantless search of their homes to confiscate their lawfully owned common firearms, *see MedImmune, Inc. v. Genentech, Inc*., 549 U.S.118, 128-29, (2007) ("…where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."); or (3) attempt to purchase a handgun without applying for a permit and subject themselves to prosecution, including a warrantless search of their homes to confiscate their lawfully owned common firearms. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (plaintiff can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder); *Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (standing existed where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), *vacated on other grounds*, 563 U.S. 1030 (2011); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (rejecting

the government's argument that "no harm is imminent because no prosecution is pending").

53.     SS 1 for SB 2 amended the prior version of 11 *Del. C.* § 1448A and B, and added a new § 1448D entitled: "Handgun qualified purchaser permit required to purchase handguns." Among the added definitions was a new definition of handgun, which now states: "(2) 'Handgun' means a pistol, revolver, or other firearm designed to be readily capable of being fired when held in 1 hand."

54.     All applications must also be processed through one person called the Director: "(1) 'Director' means the Director of the State Bureau of Identification." §1448D(a)(1).

55.     All individuals, excluding those who hold a valid concealed carry deadly weapons (CCDW) license, are required to submit an application for a handgun license. § 1448D(c)(2).

56.     All applications will require approval of one person, the Director of the State Bureau of Identification ("the Director"), giving an unelected agent of the state government discretion over approval and denial of permits,[9] and discretionary power over revocation of previously issued permits to purchase handguns. § 1448D(h)(i)

---

[9] Generally, a statute or ordinance vesting discretion in administrative officials without fixing any adequate standards for their guidance is an unconstitutional delegation of legislative power. *Hindt v. State*, 421 A.2d 1325, 1331 (Del. 1980) (citing *State v. Durham*, 191 A.2d 646, 649 (1963)).

("If the Director determines that a person does not qualify under subsection (b) of this subsection for a handgun qualified purchaser permit, the Director shall deny the application and notify the person in writing…").

57.    SS 1 for SB 2, therefore, gives an agent of the government discretion over who to grant and deny a permit to purchase handguns.

58.    The Director, at his or her sole discretion, is empowered to deny a permit to any person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." § 1448D(f)(3).

59.    The Director, may also revoke a permit, "at any time," on his discretionary finding that a person possessing a permit "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." §§ 1448D(f)(3), (*l*)(1).

60.    If the Director revokes a license, the State Police and/or local law enforcement—based on that fact alone—have purported "probable cause" to remove the firearms from the individual's "custody, possession, or control," which is an unconstitutional search and seizure, and a perversion of the term probable cause. *See* § 1448D(k)(3).

61.    Further, during the floor debate in the Delaware House of Representatives for SS 1 for SB 2, on March 7, 2024, Former Secretary Nathaniel McQueen, stated upon revocation of a permit, "all weapons in the home are to be

removed." That is, he intends to confiscate even those firearms not purchased with the Permit-to-Purchase license.

62.    The permit requirement also includes an exhaustive list of information an applicant must provide, including race, ethnicity, national origin, and a physical description including distinguishing characteristics. § 1448D(d)(1). Another requirement is that a person must be at least 21 years of age[10] to be granted a permit, which is unconstitutional on its face.[11]

63.    Not only is the amount of information the applicant must provide onerous, but they also must attend a certified "firearms training course" with 11 different parts—one part more than the course required to obtain a CCDW permit in the State of Delaware. Another requirement is to fire at least 100 rounds of ammunition. The individual must also submit to fingerprinting and undergo a state and national background check. All of this at the applicant's expense.

_____

[10] "(f) Except as otherwise provided under this chapter, the Director may not issue a handgun qualified purchaser permit to any of the following: (1) A person under the age of 21" § 1448D(f)(1).

[11] This issue of banning firearm purchases by those 18-to-20-years-old is also being litigated in Federal Court at: *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. 22-1624-RGA (First Amended Complaint filed Oct. 18, 2023). *Cf. Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025), (finding Pennsylvania law unconstitutional that banned possession by 18-20-year-olds of firearms.). The Delaware Superior Court recently held that such a ban violated the Delaware Constitution. *Birney,* WL 2836751 at *1. Cross-appeals of that decision are pending.

64.     Moreover, the state has 30 days to act on the application before a person is able to exercise an enshrined right in the U.S. Constitution.[12] § 1448D(h). However, there is no provision in SS 1 for SB 2 or the procedure outlined on the State's Permit to Purchase website that provides any relief or recourse to Plaintiffs should the State fail to issue the permit within 30 days from the receipt of the application as required. The lack of any such provision alone renders a statute unconstitutional. For example, Neuberger has successfully sued the Delaware State Police many times. What if his application was lost or mislaid?

65.     SS 1 for SB 2 does not explain where the firearm used in these courses will come from if the applicants cannot purchase a handgun. The State appears to have overlooked that applicants would need to possess a handgun in order to complete the training courses SS 1 for SB 2 mandates in order to possess and own a handgun.

66.     Further, the final form of SS 1 for SB 2 that was enacted into law removed a firearms training course voucher program—in effect, leaving those without the financial means to pay for the required training without a way to purchase a handgun for self-defense. Omission of a voucher program is one of

---

[12] SS 1 for SB 2 also requires that a "NICS" check be run by the State. This is duplicative because everyone purchasing a handgun already must undergo a NICS check initiated by the federal firearms licensee (FFL) under federal law.

several ways the State discriminates against economically disadvantaged Delawareans through SS 1 for SB 2.

67.     And SS 1 for SB 2's qualified purchaser permit is only valid for a period of 2 years from the date of issuance, creating a perpetual cycle of costs, delays and other roadblocks in maintaining the ability to purchase a handgun.

68.     Section 5 of the Permit-to-Purchase Bill also leaves uncertainty as to the process and procedures of how to obtain the required permit.  Section 5 provides that Act is to be implemented either "18 months from the date of the Act's enactment," or "[t]he date of publication in the Register of Regulation of a notice by the Director of the State Bureau of Investigation that necessary processes have been established for implementation[.]"

69.     Although it appears at least some funding to implement SS 1 for SB 2 has already been authorized (*see* House Bill 100 (January 10, 2025) and House Bill 101 (January 7, 2025) attached as Exhibit B), the necessary personnel and other infrastructure to apply for and process permit applications is not in place.

70.     On October 17, 2025, the Delaware State Police made an announcement on its website regarding the upcoming launch of SS 1 for SB on November 16, 2025. *See* Exhibit C. While the announcement "encourages Delaware residents planning to buy a handgun to visit the Permit to Purchase website to learn about the training

and documentation requirements associated with the new law," the announcement notes that the registration link to apply for the required permit is "inactive." *Id.*

71. The State's "Permit to Purchase" website (https://dsp.delaware.gov/permit-to-purcahse) also demonstrates the lack of infrastructure in place. Although as of at least October 31, 2025, the Delaware State Police "Permit to Purchase" website (https://dsp.delaware.gov/permit-to-purchase) does have an active link to an application, other sections of that website are not fully operational. For example, the "Link to Permit to Purchase regulations" includes a parenthetical that reads "to be developed."

72. One "approved" firearms trainer also reported on October 28, 2025, that he cannot offer SS 1 for SB 2's mandatory training course until November 22, 2025, six days after the effective date. *See* Cris Barrish, Ready or not, Delaware law requiring permit to buy handgun takes effect next month, WHYY.ORG (https://whyy.org/articles/delaware-handgun-permit-law-background-check/) a copy of which is attached hereto at Exhibit D.

73. In addition, an October 6, 2025, email from Christopher Popp of the Delaware State Police to Federal Firearms Licensees further confirms the necessary infrastructure to implement SS 1 for SB 2 is not in place. *See* Exhibit E. In that email, Lieutenant Popp notes that the Firearm Transaction Approval Program ("FTAP") "has been delayed for some time…[due to] critical errors that needed to

be addressed" and "[w]e don't want to put out a program that is not effective and make sure it's thoroughly tested thoroughly tested for accuracy." Lieutenant Popp also stated that "the testing period will last a few weeks and we will not release the program until we are 100% confident in its accuracy."

74.    The Permit-to-Purchases Bill requires the State Bureau of Investigation (SBI) to conduct all background checks. But the FTAP is not operational. The FFLs are not authorized to do the SBI's work.

75.    Therefore, although SS 1 for SB 2 will be implemented on November 16, 2025, Delaware citizens, including the Plaintiffs, have been and continue to be unable to apply for the required permit to purchase a handgun under SS 1 for SB 2, and it is unknown when they will be able to do so.

76.    This resulting inability of Plaintiffs to obtain the required permit— when a permit to purchase a handgun remains a necessity—amounts to an unconstitutional handgun ban. *Heller,* 554 U.S. at 635 (holding that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of self-defense.").

77.    An effective handgun ban is consistent with State's purpose behind enacting SS 1 for SB 2. When promoting the legislation, the Governor stated that the intent of the law is to "prevent [people] from picking up a gun in the first place."

Esteban Parra, *Delaware governor signs 'permit to purchase' gun bill into law,*
Delaware Online (May 16, 2024, 3:38 PM). A copy of the article is attached as
Exhibit F.

78.    Plaintiffs further contend that the regulations set forth in SS 1 for SB2,
including the Firearms Training Course Guidelines and the guidelines the State must
follow to issue the permit, are regulations subject to Delaware's Administrative
Procedures Act ("APA").

79.    For example, the Firearms Training Course Guidelines (attached as
Exhibit G) are for those persons who wish to become "certified" instructors under
the SS 1 for SB 2 framework. Nowhere in the statute, however, is authority granted
to the State Bureau of Identification to create a list of "certified" instructors.

80.    To implement any of the regulations required by SS 1 for SB 2, those
proposed regulations must be first be published to give notice to the public for
comments, allow for comments by the public and a hearing, followed by final
regulations promulgating the regulations. This process takes a minimum of 90 days
to complete. Plaintiffs are unaware of any of the requisite notices being published in
the monthly Delaware Register of Regulation.

81.    To the extent guidelines relating to SS 1 for SB 2 have been finalized,
the State failed to follow the APA in creating them, which Plaintiffs contend render
them unenforceable.

## II.    HANDGUNS ARE PROTECTED ARMS

### A.    The *Bruen* Standard

82.    In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 597 U.S. at 17 (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n.10 (1961)).

83.    *Bruen* reinforced the approach to assessing a Second Amendment challenge that the Court had established in *Heller*. That approach requires: (1) determining, through textual analysis, that the Second Amendment protected an individual right to be armed; and (2) relying on the historical understanding of the Second Amendment to demark the limits on the exercise of that right.[13]

84.    "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end

---

[13] The Supreme Court did not establish a separate standard for challenges of statutes requiring permits to exercise Second Amendment rights.

scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

85.     When reviewing restrictions on firearms, *Bruen* first requires an answer to the question of whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 18. Once it is established that the law in question does regulate conduct protected by the Second Amendment's plain text as SS 1 for SB 2 does, the law is presumed invalid, and the burden shifts to the State to provide historical analogues from the time of the Nation's founding that demonstrate that SS 1 for SB 2 is consistent with the Nation's tradition of firearm regulation. *Id.* at 19 ("The government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

86.     Handguns and/or pistols subjected to the rigorous licensing requirement for purchase and/or ownership by SS 1 for SB 2 are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 8 (citing *Heller*, 554 U.S. at 629).

87.     The State cannot satisfy its burden to demonstrate, by historical analogue, that SS 1 for SB 2 is consistent with this Nation's historical tradition of firearm regulation.

88.     Specifically, the State will not be able to identify laws or regulations from the relevant historical periods that required law-abiding citizens to satisfy a burdensome and time-consuming permitting scheme before purchasing a firearm.

## III.    PRE-*BRUEN* PRECEDENT

89.     In *McDonald*, 561 U.S. at 750, 791, the U.S. Supreme Court confirmed that the rights protected by the Second Amendment are "among those fundamental rights necessary to our system of ordered liberty," and held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment.

90.     The *Heller* Court recognized that the handgun is "the quintessential self-defense weapon" in the United States, and that a ban on handgun possession violated the Second Amendment. *See Heller*, 554 U.S. at 627, 629 (citing, *e.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846)).

91.     *Bruen* first requires an answer to the question: whether SS 1 for SB 2 regulates conduct protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 17.

92.     The Second Amendment extends to "all instruments that constitute bearable arms," *id.* at 28, i.e., "anything that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581.

93.    *Heller* and *Bruen* establish that the Second Amendment protects possessing and carrying handguns. *Bruen*, 597 U.S. at 32-33 ("[W]e remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home […] we did not suggest that the need was insignificant elsewhere."). The exception to this fundamental right is to arms that are both "dangerous and unusual," but if an arm is "in common use" then it is, by definition, not dangerous *and* unusual. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J. concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.").

94.    *Heller* and *Bruen* held that handguns were in "common use" and protected by the Second Amendment. *Heller*, 554 U.S. at 628; *Bruen*, 597 U.S. at 10.

95.    Further, the right to "keep and bear arms" protected by the Second Amendment "surely implies the right to purchase them." *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 583, 590 (5th Cir. 2025) (citing *Luis v. United States*, 570 U.S. 5, 26 (2016) ("Constitutional rights…implicitly protect those closely related acts necessary to their exercise."); (*Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." (quoting *Ezell v. City of Chicago*, 651 F. 3d 684, 704 (7th Cir. 2011));

166398698.1

Antonin Scalia & Bryan A. Garner, *Reading Law; The Interpretation of Legal Texts* 96 (2012)) (When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.").

96.     If the conduct at issue is presumptively protected by the Second Amendment's text, as it is with SS 1 for SB 2, the State has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 23.

97.     The State must "identify a well-established and representative historical analogue" to its regulation. *Id*. at 30. This feat is not possible for the State to accomplish in this case.

98.     The Supreme Court has demonstrated that this historical analysis and review of prospective analogues should focus on the time of the Second Amendment's ratification, warning that "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 36; *see also United States v. Rahimi*, 602 U.S. 680, 738 (2024) (Barrett, J., concurring) ("evidence of 'tradition' unmoored from original meaning is not binding law.").

99.     *Bruen*, therefore, made the "general [] assum[ption] that the scope of the protection applicable to the Federal Government and States is pegged to…1791." 597 U.S. at 37; *see also id*. at 82–83 (Barrett, J., concurring) ("1791 is the

166398698.1

32

benchmark" because "Reconstruction-era history" alone is "simply too late (in addition to too little)," and rejecting "freewheeling reliance on historical practice from the mid-to-late 19th century…"). The Supreme Court recently reinforced this in *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29 & n.7), stating that, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit 'apply[ing] faithfully the balance struck by *the founding generation* to modern circumstances.'" (emphasis added); *see also id*. ("For example, if laws at *the founding* regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.")[14] (emphasis added).[15]

100.    *Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in

---

[14] *Rahimi*, 602 U.S. at 696, 697, also draws its analogues almost exclusively from the founding era, citing K. Ryan, "The Spirit of Contradiction": Wife Abuse in New England, 1780–1820, 13 Early American Studies 586, 602 (2015); 1795 Mass Acts Ch.2, in Acts and Resolves of Massachusetts, 1794–1795; 1786 Va. Acts ch. 21; 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652–53 (1807); Acts and Laws of His Majesty's Province of New-Hampshire in New England 2 (1761); Collection of All of the Public Acts of Assembly of the Province of North-Carolina: Now in Force and Use 131 (1751) (1741 statute).

[15] The Third Circuit followed suit in *Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), a case decided recently after the Supreme Court remanded for further consideration in light of *Rahimi*, but did not reverse.

*Heller:* handgun violence, primarily in urban area[s]." 597 U.S. 1 at 27 (quotation omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the founding[.]" *Id.*

### B.    SS1 for SB 1 Facially and As-Applied Violates the *Bruen* Standard

101.   The firearms at issue in this case, handguns, unquestionably fall within the scope of the Second Amendment, as the Supreme Court in *Heller* held that handguns are the most popular weapon chosen by Americans for self-defense. 554 U.S. at 629. In *Heller,* the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities"—by imposing a licensing regime with the result of effectively banning handgun possession in the home. *Bruen,* 597 U.S. at 27.

102.   In evaluating the licensing regime challenged in *Heller*, the Supreme Court in *Bruen* stated, "the Founders themselves could have adopted [a similar law] to confront that problem," but they did not. *Id.* When striking down the handgun ban in *Heller*, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id.* (citations omitted).

103.   In this case, there is also no historical regulation relevantly similar to the Permit-to-Purchase requirement. At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to

be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 232 (2018) (cited with approval in *Bruen,* 597 U.S. at 30). However, "[u]ntil the early twentieth century, there were no laws that required that individuals receive government permission before purchasing or borrowing a firearm." David Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy* ("Kopel"), 53 HARV. J. ON LEGIS. 303, 336 (2016).[16]

### C. SS 1 for SB 1's Provision for the Denial of a Permit on the Basis of the Director's Sole Determination that an Applicant Poses a Danger of Causing Physical Injury to Self or Others Violates the Second Amendment

104. SS1 for SB 1 also permits the Director, at his or her sole discretion, to deny a permit to any person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms." 11 *Del. C.* § 1448D(f)(3).

105. The Director may also revoke a permit, "at any time," on his or her discretionary finding that a person possessing a permit "poses a danger of causing

---

[16] The *Bruen* Court refused to recognize for this analysis laws that were "late-in-time" for establishing a Second Amendment historical analogue. 597 U.S. at 66 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici."). *Bruen* also instructed that "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen,* 597 U.S. at 36.

physical injury to self or others by owning, purchasing or possessing firearms." §§ (f)(3); (*l*)(1).

106.   In *Rahimi*, the Supreme Court upheld a challenge to 18 U.S.C. § 922(g)(8), a materially different law that prohibits an individual subject to a domestic violence restraining order, issued by a court, from possessing a firearm if that order includes a finding that he represents a credible threat to the physical safety of an intimate partner, or a child. *Rahimi*, 602 U.S. at 680.

107.   But the Supreme Court made the limitations of its holding clear, emphasizing that, "we conclude only this: An individual found *by a court* to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment." *Id*. (emphasis added).

108.   The Supreme Court, therefore, sharply distinguished laws that limit individuals *found by a court* to be dangerous, from those, like SS 1 for SB 2, that apply to the public generally, and do so arbitrarily. *Id.* at 698 ("Section 922(g)(8) restricts gun use to mitigate *demonstrated* threats of physical violence, just as the surety and going armed laws do. Unlike the regulation struck down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally.") (emphasis added).

109.   In addition to basing its decision on the pre-existence of a court order, *Rahimi* rejected the notion that a person "may be disarmed simply because he is not

'responsible,'" further rejecting broad disarmament of the public on the basis of vague and arbitrary determinations of bureaucrats like the Director. *Id.* at 702–703 ("'Responsible' is a vague term," "[i]t is unclear what such a rule would entail," and such a standard does not "derive from our case law," which "said nothing about the status of citizens who were not 'responsible.'").

110.   Likewise, *Bruen* rejected the idea that a person could be disarmed because of "a perceived lack of …suitability." *Bruen* 597 U.S. at 13; *see also id.* at 14–15 (identifying impermissible "may issue" regimes by the requirement that applicants "demonstrate[] cause or suitability").

111.   SS 1 for SB 2 has no objective criteria for a determination, by a court, of "a credible threat" present in the *Rahimi* matter or a court order containing a finding that Rahimi had committed "family violence," that was "likely to occur again," and that Rahimi posed "a credible threat" to the "physical safety" of his girlfriend and young child. 602 U.S. at 687.

112.   Rather, SS1 for SB 2 merely impermissibly cloaks a vague "may issue" and "suitability" styled statute in the discretion of the Director.

113.   The Permit-to-Purchase legislation challenged in this case, with its discretionary and subjective criteria vested with the Director, is consistent with the history of the repugnant racist licensing laws which *Bruen* refused to consider as relevant. *Bruen*, 597 U.S. at 62.

166398698.1

114.    This history of licensing laws for possession of firearms (not just carrying) aligns with the ugly racist history of gun-control laws in general, especially in the 1800s. Delaware law was no exception. *See* 8 LAWS OF THE STATE OF DELAWARE 208 (1841). Delaware charged "twenty-five cents" for "licenses to negroes to keep a gun." 9 LAWS OF THE STATE OF DELAWARE 430 (1843).[17]

115.    It is no coincidence that other firearm licensing statutes with provisions that were either vague and/or targeted at certain minority groups arose in the period around emancipation. *See Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857) (Chief Justice Roger Taney offensively lamenting that were the slaves freed, it "would give to persons of the negro race" the right "to keep and carry arms wherever they went.")

116.    Similarly, in a shameful period of history, states began to restrict the carrying of firearms, with laws generally "passed for the purpose of disarming the negro [and were] never intended to be applied to the white population…generally conceded to be in contravention to the Constitution and non-enforceable if contested." *Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941); *see also State ex rel. Russo v. Parker*, 57 Fla. 170 (1909).

---

[17] A few outlier states, such as Oregon and New York, passed laws in the twentieth century requiring a license to purchase pistols or revolvers for the documented purpose of preventing what they viewed as "dangerous classes" such as "freed Blacks" or Italian immigrants from possessing firearms. Robert J. Cottrol & Brannon P. Denning, *To Trust the People with Arms: The Supreme Court and the Second Amendment*, at 57–58 (University Press of Kansas 2023).

117.   As Justice Kavanaugh explained in *Rahimi*, laws with origins in racism are contrary to the Fourteenth Amendment, which sought to "reject the Nation's history of racial discrimination, not backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution." *Rahimi,* 620 U.S. at 723 (Kavanaugh, J., concurring).

118.   Delaware's SS 1 for SB 2 facially violates the Second Amendment and is unconstitutional in its placement of the discretionary power to grant or deny a permit with an unelected bureaucrat, the Director, based upon discretionary and vague criteria.

119.   The conduct SS 1 for SB 2 regulates is protected by the Second Amendment and Defendants cannot establish that the law is consistent with either the Nation's or Delaware's history and tradition of firearms regulation. There is no historical support for a permit-to-purchase requirement for firearms.[18]

---

[18] Many other parts of SS 1 for SB 2 have no justification based on the Nation's historical tradition. For instance, there is no historical tradition of requiring a training course merely to possess a handgun in any of the States during the relevant period. *See* George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION 117 (1938) (1741 Delaware law requiring that "every Freeholder and taxable Person" possess "[o]ne well-fixed Musket or Firelock."); 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667, at 345 (1965 Reprint) (A law requiring all people able to carry firearms to carry a firearm); 5 LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–1792, at 178–79 (1916) (An act requiring all able bodied men from 16-40 to be prepared with a firearm for military service); 1 Hening, THE STATUTES AT LARGE, at 127 (A 1623 law requiring arms to travel); 1 AMERICA'S FOUNDING CHARTERS:

### D.     Untangling the "May Issue" and "Shall Issue" Distinction in the Context of SS 1 for SB 2

120.   Some outlier states defending permitting schemes across the nation have clung to dicta in *Bruen* on the issue of so-called "shall issue" vs. "may issue" permitting schemes.

121.   Painting with an overly broad brush, those rogue states wrongly suggest that *Bruen* supports the notion that simply prefacing any permitting scheme with the phrase "shall issue" immunizes that scheme (and its requirements, whatever they may be) from a Second Amendment challenge.  This suggestion draws too much from too little.

122.   First, the context of this dicta in *Bruen* must be considered.  In *Bruen*, the Supreme Court examined New York's proper cause requirement for obtaining a carry permit. Under the challenged statute, a New Yorker who sought to carry a firearm outside their home or place of business for self-defense, was required obtain an unrestricted license to "have and carry" a concealed "pistol or revolver."  To secure that license, the applicant was required to prove that "proper cause exists" to issue it. *Id*. at 15.

---

PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11 (Jon Wakelyn ed., 2006) (Concessions and Agreements, Jan. 11, 1664).

123.   For purposes of drawing a distinction between New York's particularly oppressive public carry statute and that of many other states, the Supreme Court broadly characterized the New York law as one of a few outlier states with permit statutes, while broadly characterizing 43 other states as having "shall issue" permit statutes. *Id*. at 17.

124.   The premise of this distinction was that the text of the "may issue" statutes granted authorities "discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id*. at 14–15.

125.   The Supreme Court made this distinction for purposes of demonstrating that either facially, and/or in practice, the New York statute in question represented a relative outlier statute, among the states, as to public carry. *Id*. at 101 (Kavanaugh, J., concurring) ("Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment."); *id*. at 102 ("New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials . . .").

126.   Those 43 statutes broadly categorized as "shall issue" in *Bruen* were not subject to the *Bruen* test because the validity of those statutes were not before the Supreme Court in that matter.

127.    The Supreme Court, in fact, cursorily acknowledged that the 43 statutes (at the time of its decision) were not, themselves, identical to each other. Many were categorized as "shall issue" on the basis that the Supreme Court believed that the language of their statute demonstrated "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 17.

128.    However, a smaller sub-set, including Delaware's, were categorized as "shall issue," not by the language of the statute itself but by how the Supreme Court perceived they operated in practice in those states. *Id.* at 17, n.1 ("Three States— Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. *See* Conn. Gen. Stat. §29-28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11-47-11 (2002).").

129.    *Bruen*, therefore, did not rule on the constitutionality of the 43 statutes broadly categorized as "shall issue." Rather, it required that licensing processes, in the context of public carry, use "narrow, ***objective***, and definite" standards, while flatly prohibiting the "appraisal of facts, the exercise of judgment and the formation of an opinion." *Id.* at 38 n.9 (emphasis added).

130.    *Bruen* simply contrasted the features of New York's licensing scheme—which did prevent most people from "exercising their Second Amendment

right to public carry"—with other regimes, not part of the Court's ration *decidendi*; which did "not necessarily prevent" the same because they "appear[ed] to contain" certain features. *Id*.

131.   Any suggestion that the Supreme Court endorsed the constitutionality of those 43 public carry statutes broadly characterized as "shall issue" is false.[19] Further, SS 1 for SB 2 requires a permit for purchase and ownership of a handgun rather than for purposes of public carry, the use addressed by those 43 statutes.

132.   The Supreme Court then more directly addressed the necessity of objective, non-discretionary criteria for denying fundamental Second Amendment rights in *Rahimi*.[20]

133.   The restraining order in *Rahimi* included a finding by a court that Rahimi had committed "family violence," that was "likely to occur again," and that Rahimi posed "a credible threat" to the "physical safety" of his girlfriend and young child. *Id*. at 687.

---

[19] *Bruen*, 597 U.S. 1 at 13-*14 (making clear that New York's "proper cause," "may issue" outlier regime was what was before the Court for determination in the matter).
[20] Notably, in *Bruen*, the vast majority of the "43…'shall-issue' licensing regimes" the Court identified do not condition public carry on issuance of a license, with many either being "constitutional carry" jurisdictions, or allowing unlicensed open carry. *Id*. They were not permit-to-purchase schemes. Thus, the constitutionality of these entirely voluntary licensing regimes say nothing about the constitutionality of a licensing scheme encompassing (1) ownership of common arms; (2) which citizens must comply with in order to purchase or possess common arms. *See, e.g*., www.usconcealedcarry.com/blog/constitutional-carry-in-states (29 states now have a state constitutional provision that allows for carrying a firearm without a license.).

134.    Rahimi was given an opportunity to contest the testimony his girlfriend provided in support of the order and did not do so. *Id*. at 686.

135.    In upholding 18 U.S.C. § 922(g)(8) in the face of Rahimi's challenge, the Supreme Court made a discreet ruling: "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702.

136.    Contrast the context and substance of the *Rahimi* holding[21] with how the State of Delaware seeks to disarm its citizens through permit denial. SS 1 for SB

---

[21] *Bruen*'s "shall-issue" vs. "may-issue" dicta in the public carry context (which did not refer to a permit-to-purchase scheme), is notable to the extent that the statutes referenced in that dicta contained language defining what objectively constituted a "danger" that is entirely absent from SS 1 for SB 2: Mo. Rev. Stat. § 571.101 (2016) ("[a] concealed carry permit . . . shall be issued . . . if the applicant . . . [h]as not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have a reasonable belie*f* that the applicant presents a danger to himself or others.") Mont. Code Ann. § 45-8-321 (2021) (a sheriff "may deny an applicant a permit to carry a concealed weapon if the sheriff has reasonable cause to believe that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon."); N. D. Cent. Code Ann. § 62.1-04-03 (Supp. 2021) (The bureau of criminal investigation, which grants concealed carry permits, "may deny approval for a license if the bureau has reasonable cause to believe that the applicant . . . has been or is a danger to self or others as demonstrated by evidence, including past pattern of behavior involving unlawful violence or threats of unlawful violence; past participation in incidents involving unlawful violence or threats of unlawful violence; or conviction of a weapons offense.") Wyo. Stat. Ann. § 6-8-104 (2021) (the state shall deny a permit "upon reasonable grounds for denial" which include "facts known to the sheriff which establish reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state,

2 requires only that the Director at his or her sole discretion, determine that a person who "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," to deny a permit and disarm that person. 11 *Del. C.* § 1448D(f)(3).

137.   The vague, discretionary standard in SS 1 for SB 2 bears no resemblance to the court-ordered restriction involved in *Rahimi's* discreet holding. Rather, it bears similarity to what *Rahimi* rejected—the Government's argument that Rahimi could be disarmed "simply because he is not 'responsible.'" *Rahimi*, 602 U.S. 680 at 701.  The Supreme Court found "responsible" to be an impermissibly vague term that represented a line that did not "derive from our case law." *Id*.

138.   Regardless of inapposite dicta, it remains undisputed that the Second Amendment's 'plain text' covers the regulated conduct in SS 1 for SB 2, and the government has only one way to carry its burden to defend the regulation—by proving that it is consistent with this Nation's historical tradition of firearm regulation. This they cannot do.

---

as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section.")

139.    The State will not be able to "affirmatively prove," based on "historical precedent," that an "enduring" and "comparable tradition of regulation" justifies SS 1 for SB 2. *Bruen*, 597 U.S. at 19, 27, 67.

140.    Therefore, SS 1 for SB 2 violates the Second Amendment and must be stricken.

141.    By its terms, SS1 for SB2 will be implemented no later than November 16, 2025.

## COUNT I

### Claim under 42 U.S.C. § 1983 for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution

142.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

143.    There is an actual and present controversy between the parties.

144.    The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens their fundamental right to keep and bear arms, both in the home and in public.

145.    The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

146.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive, or possess common firearms for all lawful purposes, including self-defense.

147.   SS 1 for SB 2 impermissibly restricts the right to purchase a handgun for any lawful purpose, including self-defense, without first following a lengthy, arduous process that vests unconstitutional discretion in the hands of the Director as to whether a permit will be granted. This includes a ban on those 18-to-20-year-olds from purchasing and owning "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

148.   SS 1 for SB 2's permitting scheme further violates the Second Amendment of the United States Constitution because:

(a)    it denies a constitutional right until a permit to exercise that right is issued;

(b)    the permitting process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague, and arbitrary;

(c)    the permitting process, both on the face of the statute and as applied, was designed to deny constitutional rights and make it more burdensome to exercise them, especially those of limited economic means.

166398698.1

149.   SS 1 for SB 2's implementation process also violates the Second Amendment of the United States Constitution because it will be implemented by its terms on November 16, 2025—but without the necessary infrastructure being established for its implementation, resulting in a handgun ban because there will be no process in place for law–abiding citizens to obtain the required purchaser permit.

150.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

151.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Second and Fourteenth Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger; Jerry Martin; William R. Hague, Jr.; Bruce C. Smith; Bridgeville Kenpo Karate, Inc., doing business as BKK Firearms; DSSA and its members; and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2.

152.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Second Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## COUNT II

### Claim under 42 U.S.C. § 1983 for Deprivation of Plaintiffs' Rights Under the Fourth Amendment

153.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

154.   There is an actual and present controversy between the parties.

155.   The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

156.   The very core of the Fourth Amendment's guarantee is the right of a person to retreat into his or her home and "there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Florida v. Jardines*, 569 U. S. 1, 6 (2013)).

157.   Facial challenges under the Fourth Amendment are not categorically barred or especially disfavored. *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015).

158.   The Supreme Court has, on numerous occasions, declared statutes facially invalid under the Fourth Amendment. *See, e.g. Chandler v. Miller*, 520 U.S. 305, 308-309 (1997) (striking down a Georgia statute requiring candidates for

166398698.1

certain state offices to take and pass a drug test, concluding that this "requirement . . . [did] not fit within the closely guarded category of constitutionally permissible suspicionless searches"); *Ferguson v. Charleston*, 532 U.S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment); *Payton v. New York*, 445 U.S. 573, 574, 576 (1980) (holding that a New York statute "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest" was "not consistent with the Fourth Amendment"); *Torres v. Puerto Rico*, 442 U.S. 465, 466, 471 (1979) (holding that a Puerto Rico statute authorizing "police to search the luggage of any person arriving in Puerto Rico from the United States" was unconstitutional because it failed to require either probable cause or a warrant).

159.    While in a facial challenge a plaintiff must establish that a "law is unconstitutional in all of its applications," when the Court assesses whether a statute meets this standard, it considers "only applications of the statute in which it actually authorizes or prohibits conduct." *City of L.A. v. Patel*, 576 U.S. at 418. Such "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is

irrelevant." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 894 (1992).

160.   Therefore, when addressing a facial challenge to a statute authorizing warrantless searches, "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *City of L.A. v. Patel*, 576 U.S. at 418.

161.   The Supreme Court has repeatedly held that "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 228 (2009) (quoting *Katz v. United States*, 389 U. S. 347, 357 (1967)).   This rule "applies to commercial premises as well as to homes." *Marshall v. Barlow's, Inc*., 436 U.S. 307, 312 (1978).

162.   Search regimes where no warrant is ever required may be reasonable only where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Skinner v. Railway Labor Executives Assn'n,* 489 U.S. 602, 619 (1989) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (some internal quotation marks omitted), and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control," *Indianapolis v. Edmond,* 531 U.S. 32, 44 (2000).

163.   Further, in a case litigated and won by undersigned counsel against the State, the Delaware Superior Court struck down a law on Fourth Amendment grounds that allowed excessive and untethered search and seizure of firearms. *See Del. State Sportsmen's Ass'n v. Garvin,* 196 A.3d 1254, 1277 (Del. Super. 2018) ("A law enforcement officer with complete discretion to conduct searches 'impinges on ... [the] rights to be free from unreasonable searches under the Fourth Amendment.'") (internal quotations omitted).

164.   SS 1 for SB 2's Permit-to-Purchase scheme has no analogue in the relevant historical tradition of firearms regulation in this Nation and, therefore, violates the Second Amendment. Moreover, SS 1 for SB 2's provisions for effecting the "surrender" and "removal" of firearms from Delawareans whose permits are revoked also violates the Fourth Amendment.

165.   SS 1 for SB 2 grants the Director of the State Bureau of Identification, an unelected bureaucrat, the power to revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms," and thus the Director would have the discretion to effect the "surrender" or "removal" of firearms from that Delawareans home without a warrant.

166.   Further, the comments on the House floor by Secretary McQueen indicate that such "surrender" and "removal" would apply to all guns in the home, not just those the State purports to remove pursuant to revocation of a permit.

167.   SS 1 for SB 2, therefore, authorizes, in all its relevant applications, the search and seizure of lawfully owned common arms outside the judicial process, without prior approval by a judge or a magistrate judge.

168.   SS 1 for SB 2 further authorizes this search and seizure of lawfully owned common arms without any pre-compliance review before a neutral judicial decisionmaker.

169.   SS 1 for SB 2's provision for the warrantless removal from the home of firearms based upon the subjective and nebulous "danger of causing physical injury" standard is a per se violation of the Fourth Amendment's protection against unreasonable search and seizure.

170.   A recent unanimous Supreme Court opinion in *Caniglia v. Strom*, 141 S. Ct. at 1600 (2021), is on all fours with this matter. There, the Supreme Court held that the warrantless removal of firearms from the home of a man who police determined to be "a risk to himself or others" was a violation of the Fourth Amendment.[22]

---

[22]   In *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1275 (Del. Super. 2018), a case that the State did not appeal to the Delaware Supreme Court, the Superior Court found a regulation unconstitutional under the Fourth Amendment,

171.   In *Caniglia*, the Supreme Court reinforced the principle that the "'very core'" of the Fourth Amendment's guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Caniglia*, 593 U.S. at 198 (quoting *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013)).

172.   SS 1 for SB 2 seeks to codify exactly what the United Supreme Court determined was a Fourth Amendment violation.

173.   Plaintiffs, Neuberger, Martin, Hague, and members of DSSA and BRPC have concrete plans to purchase a handgun covered by SS 1 for SB 2's permit requirement, and SS 1 for SB 2 vests unbridled discretion in the Director to deny their permit application and/or to revoke their permit and effectuate a warrantless search of their homes to confiscate their lawfully owned common arms.

174.   Plaintiffs will be subjected to enforcement of SS 1 for SB 2 because they have concrete plans to purchase a handgun covered by SS 1 for SB 2 or may sell a handgun to someone without the required permit. Thus, SS 1 for SB 2 leaves Plaintiffs with a Hobson's choice—(1) subject themselves to a lengthy and arduous 11-point process and the unbridled discretion of the Director to deny or revoke their permit and effectuate a warrantless search of their homes to confiscate their lawfully

---

where in the course of investigation of gun possession in Delaware State Parks, State officials were given "unfettered discretion to stop State Park and Forest visitors…without requiring a scintilla of evidence of criminal activity."

owned common arms; (2) decline to purchase a permit-less handgun out of fear of prosecution and warrantless search of their homes to confiscate their lawfully owned common arms, *see MedImmune, Inc. v. Genentech, Inc*., 549 U.S.118, 128-29, (2007); or (3) purchase a handgun without applying for a permit and subject themselves to prosecution and the warrantless search of their homes to confiscated their lawfully owned common arms. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (a plaintiff can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder); *Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (standing existed where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), *vacated on other grounds*, 563 U.S. 1030 (2011); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (rejecting the government's argument that "no harm is imminent because no prosecution is pending").

175.   Further, Director McQueen's comments on the House floor stating that his purported authority to enforce the "surrender" and "removal" of lawfully owned common arms would apply to all guns in the home, not just those the State purports to remove pursuant to revocation of a permit. Thus, by virtue of owning a handgun,

whether with or without a permit, Plaintiffs are targets of the State's warrantless and unlawful search and seizure.

176.  Defendant's enforcement of SS 1 for SB 2, including their intended actions to effectuate the "surrender" and "removal" of lawfully owned common arms, including those arms not subject to the permit requirement, has created a reasonable fear in Plaintiffs that any purchase of a firearm, whether with or without a permit, will result in its warrantless removal by the State, through the Director. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (continuous and pervasive conduct creating a reasonable fear in Plaintiffs created standing to bring challenge).

177.  42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

178.  Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental Fourth Amendment rights in the State of Delaware, including Plaintiffs, Thomas Neuberger; Jerry L. Martin; William R. Hague, Jr.; DSSA and its members; and BRPC and its members, through Defendants' enforcement and implementation of SS 1 for SB 2

179.  For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Fourth Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

166398698.1

## COUNT III

### Void for Vagueness

180.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

181.   There is an actual and present controversy between the parties.

182.   Statutes that are vague and arbitrary violate the Due Process Clause of the Fourteenth Amendment. *See, e.g., Springfield Armory, v. City of Columbus,* 29 F.3d. 250, 251 (6th Cir. 1994).

183.   The Supreme Court's void for vagueness doctrine's primary objective is to guard against "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (underscoring the threat that vague laws pose to legislative policymaking primacy).

184.   A more "stringent" vagueness test applies for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

185.   Further, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for

166398698.1

resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and  discriminatory applications." *Id*. at 498.

186.   SS 1 for SB 2 infringes upon the fundamental constitutional rights of Plaintiffs, namely their Second Amendment right to bear arms. *See Bruen*, 597 U.S. 1,  at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 789 (2010)) ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.').

187.   SS 1 for SB 2 is impermissibly vague, in that it grants the Director of the State Bureau of Identification, an unelected bureaucrat, the power to deny or revoke the permit of any Delawarean who, according to the sole discretion of the Director, "poses a danger of causing physical injury to self or others by owning, purchasing or possessing firearms."

188.   SS 1 for SB 2, therefore, fails to provide a reasonable opportunity to know, by what standards a permit applicant, including Plaintiffs, will be judged.

189.   Persons of common intelligence must necessarily guess at the meaning, scope and application of SS 1 for SB 2's "danger" standard for denying and/or revoking a permit.

190.   The unbridled discretion that SS 1 for SB 2's impermissibly vague standards vest in the Director impermissibly delegates policy matters to the Director, and undoubtedly invites arbitrary and discriminatory application.

191.   This vagueness also has a chilling effect on Plaintiffs' constitutionally protected conduct.

192.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of the Second Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

193.   A judgment that SS 1 for SB 2 and all related regulations, policies, and/or customs designed to enforce or implement the same, are a violation of Plaintiffs' fundamental right to keep and bear arms, including purchasing handguns for any lawful purpose without a state issued permit or license, as guaranteed under the Second and Fourteenth Amendments, as well as a violation of their rights under the Fourth Amendment to the United States Constitution. Declaratory judgment is proper in this matter, as there is a real controversy between the parties, an interest is adversely affected, and the issue is ripe for resolution;

194.   Relief pursuant to 42 U.S.C. § 1983 for deprivation by Defendants of Plaintiffs' federal constitutional rights under color of state law;

195.   Attorney's fees pursuant to 42 U.S.C. § 1988(b);

196.   Both preliminary and permanent injunctive relief to enjoin Defendants

from implementing and enforcing SS 1 for SS 2.

197.   Any and all other and further relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully submitted,

LEWIS BRISBOIS
  BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi (No. 2624)
Keith A. Walter (No. 4157)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Keith.Walter@LewisBrisbois.com

*Counsel for Plaintiffs*

OF COUNSEL:
Joseph G.S. Greenlee
National Rifle Association of
  America – Institute for Legislative
  Action
11250 Waples Mill Road
Fairfax, VA  22030

Dated:  November 3, 2025

## <u>Index of Exhibits</u>

SB 1 for SB 2 ................................................................................................................. A

HB 100 and 101 Authorizing Funding for SS 1 for SB 2 in FY 2025 ..................... B

Delaware State Police October 17, 2025 Permit to Purchase Announcement ......... C

Cris Barrish October 28, 2025 Article .................................................................... D

October 6, 2025 Email from Christopher Popp re Permit to Purchase Update ........ E

Esteban Parra May 16, 2024 Article ........................................................................ F

Permit to Purchase Firearms Training Course Guidelines ....................................... G