**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

THOMAS S. NEUBERGER; JERRY L. MARTIN; WILLIAM R. HAGUE, JR.; BRUCE C. SMITH; BRIDGEVILLE KENPO KARATE, INC. d/b/a BKK FIREARMS; DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC; and BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.,

Plaintiffs.

v.

JOSHUA BUSHWELLER, in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. WILLIAM CROTTY, in his official capacity as superintendent of the Delaware State Police,

Defendants.

Civil Action No. 1:25-cv-01341-MN

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR**
**MOTION FOR EXPEDITED INJUNCTIVE RELIEF**

Francis G.X. Pileggi (No. 2624)
Keith A. Walter (No. 4157)
Alexander D. MacMullan (*pro hac vice* admission pending)
LEWIS BRISBOIS BISGAARD & SMITH LLP
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Keith.Walter@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

*Counsel for Plaintiffs*

OF COUNSEL:
Joseph G.S. Greenlee
National Rifle Association of America – Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030

Dated: November 12, 2025

**TABLE OF CONTENTS**


I. INTRODUCTION ....... 1

II. CHALLENGERS HAVE STANDING ....... 2

III. THE EXPEDITED INJUNCTIVE RELIEF IS NOT MOOT ....... 4

A. Challengers have been unable to complete the Permit Bill's application process ....... 4

B. The State did not timely implement the Permit Bill ....... 5

C. The State's own statistics demonstrate there will be a de facto handgun ban on November 16th ....... 6

IV. THE PERMIT BILL VIOLATES THE SECOND AMENDMENT AND CHALLENGERS ARE LIKELY TO SUCCEED ON THE MERITS ....... 7

A. The Permit Bill Is Not Presumptively Constitutional ....... 7

B. The State Provides No Evidence that the Permit Bill Fits Within the Nation's Historical Tradition of Firearm Regulation ....... 8

V. CHALLENGERS HAVE SHOWN IRREPARABLE HARM ....... 9

VI. THE STATE'S ARGUMENT THAT AN INJUNCTION WOULD HARM THE PUBLIC SAFETY INTERESTS IS UNFOUNDED ....... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
176 A.3d 632, 642 (Del. 2017) ....................2

*Carney v. Adams*,
592 U.S. 53, 60, 63 (2022)....................3

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dept. of Safety and Homeland Security*, 108 F. 4th 194, 206 (3rd Cir. 2024) ....................3, 9

*Del. State Sportsmen's Ass'n v. Garvin*,
196 A.3d 1254, 1269 (Del. Super. Ct. 2018) ....................3

*Del. State Sportsmen's Ass'n v. Garvin,*
2020 Del. Super. LEXIS 2927 (Del. Super. Ct. Nov. 18, 2020)....................3, 6

*Ellison v. Am. Bd. Of Orthopedic Surgery*,
11 F. 4th 200 (3d Cir. 2021) ....................3

*Koons v. Attorney Gen. N.J.*,
2025 No. 23-1900, 2025 WL 2612055, at 43 (3d Cir. Sep. 10, 2025), as amended (Sept. 17, 2025)....................7, 10

*Lara v. Comm'r Pa. State Police*,
125 F.4th 428, 441 (3d Cir. 2025) ....................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 561 (1992)....................3

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022) ....................7

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc*.,
805 F.2d 351, 356 (10 Cir. 1986)....................10

*Watson v. Stone*,
4 So. 2d 700, 701 (Fla. 1941)....................8

**Other Sources**

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*,
31 Wm. & Mary Bill Rts. J. 93, 99 (2022) ....................9

## I. INTRODUCTION

This lawsuit challenges the constitutionality of the Permit Bill[1] that the Governor signed into law about 18 months ago. But only at the eleventh hour has the State scrambled to put in place the necessary procedures and infrastructure to implement the Permit Bill before the State begins enforcement on November 16, 2025.

Since at or about the time this lawsuit was filed with a motion seeking expedited injunctive relief, the facts have changed. But unchanged is the fire drill the State caused by the mad dash it is requiring everyone to participate in because of its failure to plan in advance over the last 18 months..

Despite the moving target, the Challengers[2] have maintained their focus. Judicial relief is still needed notwithstanding daily factual updates in the State's rush to make up for their lack of preparation over the last 18 months.

The updated Declarations that are submitted with this Reply Brief demonstrate some measure of factual dispute, but what cannot be disputed is that related to the unconstitutionality of the Permit Bill itself, Challengers will suffer imminent actual harm—such as the risk of injury due to an inability to use a handgun in self-defense—without an injunction to prevent enforcement of the Permit Bill. The State's feckless last minute rollout of the Permit Bill, has resulted in only a relatively minuscule number of permits very recently issued, compared to the estimate of 40,000 to 50,000 Delawareans who purchase handguns every year.[3]

---

[1] Capitalized terms have the same meaning as in our Opening Brief.

[2] Thomas S. Neuberger; Jerry L. Martin; William R. Hague, Jr.; Bruce C. Smith; Bridgeville Kenpo Karate, Inc., doing business as BKK Firearms (BKK); Delaware State Sportsmen's Association ; and Bridgeville Rifle and Pistol Club, Ltd. (collectively "Challengers")

[3] *See* Declaration of Alexander MacMullan at ¶s 22-26..

Simple arithmetic and deductive reasoning leads to the conclusion that the chaotic implementation of the Permit Bill will result in a de facto ban on the purchase and sale of handguns for those who cannot obtain the required permit by November 16, 2025. The vast majority of the paucity of permits only recently issued were made available to insiders—those who are exempt from most of the prerequisites for obtaining a permit. This is too little, too late.

The enforcement date for the Permit Bill should be extended until the State can demonstrate that eligible persons such as the Declarants can obtain a permit before the Permit Bill is enforced. The Permit Bill gives the State 30 days to review a permit application—with no penalty to the State, and no recourse to the applicant if the State takes more than 30 days. Thus, the enforcement of the Permit Bill should be extended at least 30 days so that those who seek a permit will have a reasonable time to obtain one. The State in its Opening Brief said that November 1, 2025, was the first date that permits were issued—*i.e*., less than 30 days from Nov. 16, 2025. Opp. at 4. The State should not require permits until the average eligible person has a reasonable time to obtain one.

## II. CHALLENGERS HAVE STANDING

The State's arguments that the Challengers do not have standing to contest the constitutionality of the Permit Bill suggests a lack of awareness or a disregard for the precedent of multiple court decisions in which the Challengers have been successful in contesting the constitutionality of Delaware statutes and regulations that violate the fundamental civil right to keep and bear arms. Both explicitly and implicitly, the following Delaware Supreme Court decision and two Superior Court decisions, that the State lost and did not appeal, recognize that the Delaware State Sportsmen's Association and Bridgeville Rifle & Pistol Club, Ltd., had standing in a similar context to challenge regulations that violated the right to keep and bear arms. *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017); *Del. State Sportsmen's Ass'n v. Garvin*,

196 A.3d 1254, 1269 (Del. Super. Ct. 2018); *Del. State Sportsmen's Ass'n v. Garvin,* Del. Super., 2020 LEXIS 2927 (Del. Super. Ct. Nov. 18, 2020). In another case still pending in this court, which has not yet been finally decided on the merits, and which was remanded by the U.S. Court of Appeals for the Third Circuit on procedural issues, *Del. State Sportsmen's Ass'n, Inc. v. Del. Dept. of Safety and Homeland Security*, 108 F. 4th 194, 206 (3rd Cir. 2024), standing of both DSSA and Bridgeville was at least implicitly recognized.

Although the section of the State's Answering Brief discussing standing does not appear to list the elements of standing, they include the following: first, the individual Challengers and the organization Challengers will suffer an actual or imminent concrete injury if they are not permitted to purchase or sell a handgun on November 16, 2025, and if they are unable to obtain a permit by that date. Declarants show they cannot do so. Second, there is a direct connection between the injury described and the unconstitutional conduct of the State complained of. Third, it is likely that a favorable decision in this matter will redress the injury complained of. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The State's reliance on *Lujan* can be distinguished on the facts. In *Lujan,* the plaintiffs had not described any concrete plans to visit the habitats about which the lawsuit was involved. Likewise distinguishable on a factual level are *Ellison v. Am. Bd. Of Orthopedic Surgery*, 11 F. 4th 200 (3d Cir. 2021) (plaintiff, unlike in the instant matter, lacked standing because he failed to allege an imminent injury and did not demonstrate that he was "able and ready" to apply for the privileges that he was challenging); *Carney v. Adams*, 592 U.S. 53, 60, 63 (2022) (the court determined that the plaintiff never demonstrated that he was "able and ready" to apply for the position at issue and that he had not presented any "anticipated time frame.") The Declarations in this case present opposite facts.

The State argues that BKK and Smith do not seek permits and therefore do not seek relief, but the truth is that they both will suffer if they cannot sell firearms without eligible purchasers having a permit. Therefore, the relief requested directly impacts an injury they will suffer.

## III. THE EXPEDITED INJUNCTIVE RELIEF IS NOT MOOT

### A. Challengers have been unable to complete the Permit Bill's application process

The State argues that this issue is moot because it has very recently distributed some permits, largely to law enforcement officers exempt from most requirements. However, Challengers still need the injunctive relief they seek—namely, postponement of enforcement of the Permit Bill until all eligible persons have a reasonable time to apply for one. Indeed, the Challengers have attempted to apply for a Permit, but have not been able to obtain one. Challenger Thomas S. Neuberger ("Neuberger"), attempted to apply for a Permit on October 27, 2025, on the Delaware State Police Website, but it read "LINK TO COME." Second Decl. of Thomas S. Neuberger (Neuberger 2nd Decl.) ¶7. As a result, Neuberger was unable to apply. This is not surprising since the State admits the application process to obtain the Permit did not open until November 1, 2025. Decl. of Jason L. Stevenson D.I. 20 ("Stevenson Decl.") ¶7. Since that time Neuberger has attempted to apply for a Permit on five separate occasions, with the latest attempt on November 11. Neuberger 2nd Decl. ¶¶ 9, 21, 23, 28, 31. All of his attempts have been unsuccessful. *Id*. ¶¶ 9, 21, 27, 35, 39.

In his Declaration, Neuberger identified at least two reasons for not being able to complete the Permit application. *See* Neuberger 2nd Decl. ¶s 11-20.

Challenger Jerry L. Martin ("Martin"), had a similar experience. As detailed in his Declaration, he also unsuccessfully attempted to apply for a Permit on November 9. Decl. of Jerry L. Martin submitted herewith ("Martin Decl.") ¶s 12-15. Accordingly, contrary to the State's

contention, Challengers do not "already have what they are seeking," and will be unable to purchase a handgun on the Permit Bill's November 16 enforcement date, thereby depriving them of their constitutional rights and causing them irreparable harm.

**B. The State did not timely implement the Permit Bill**

An unconstitutional de facto handgun ban will occur if the Permit Bill is allowed to be enforced on November 16. This crisis is entirely of the State's own making. Having created the problem, the State now asks this Court to shield it from the consequences. The Permit Bill was signed into law 18 months ago. However, it was not until less than two weeks ago that the State claims to have opened the permit application process to the public. Stevenson Decl. ¶7. The State's Declarant mentions only that: (a) an email was sent to Delaware FFLs on October 6, 2025 informing them they could register to be approved training instructors (but the list of approved training instructors was not released to the public until on or about November 3, 2025, almost a month later), and (b) an October 28, 2025 email from the State advising the FFLs of the Portal's upcoming launch. *Id.* The undisputed fact remains that the State waited over 17 months to provide public details of the rollout of the Permit Bill, and has been scrambling ever since.[4]

SBI has also created regulations that don't comply with the Administrative Procedures Act. The Delaware State Police has issued, to FFL's and prospective trainers, Firearms Training Course Guidelines that define "Firearms Training Course" as "a course of instruction conducted by an approved firearms instructor certified to teach course material in accordance with the requirements in the Rules and *Regulations* established by SBI." *See* Exhibit "A" to Declaration of Keith A.

[4] Akin to a student cramming for an exam.

Walter, Jr[5] D.I. 5 (emphasis added). This contradicts the State's statements in briefing that SBI has not created regulations for firearms training approval and administration. These extra-statutory "guidelines" are actually APA-subject regulations. The State lost this argument before in a decision they did not appeal. *See Del. State Sportsmen's Ass'n v. Garvin*, 2020 Del. Super. LEXIS 2927, *26, 2020 WL 6813997 (Del. Super. Ct. November 18, 2020) (Holding that DNREC's authority to "protect, manage, and conserve all forms of protected wildlife…does not mean that DNREC may implement additional policies and requirements, including dictating what rifles hunters were approved to use, without observing the comment and review process of the APA.")[6]

The State argues that failure to follow the APA is not relevant because it does not impede individual Challengers' ability to obtain a permit. This misses the point. The State's imposition of requirements for a permit that do not comply with the APA is another unlawful impediment to exercising a fundamental right.

**C. The State's own statistics demonstrate there will be a de facto handgun ban on November 16th**

Deductive reasoning and basic math demonstrate that the Permit Bill's failed rollout will ban handgun sales in Delaware. The Stevenson Declaration acknowledges that he is only aware of 2 "civilian permits" being approved to date. A "civilian permit" is one that is not exempt from the Permit Bill's training requirement. *See* Decl. of MacMullan at 18. Training classes are expected to accommodate between ten and fifteen trainees total. *Id*. at 11. Simple math suggests then, that

---

[5] An email from Lieutenant Christopher Popp of the Delaware State Police's Firearms Transaction Approval Program's October 6, 2025 email to FFL's reiterates this definition. *See* Declaration of Keith A. Walter, Jr. , D.I. 5, at Exhibit "D."

[6] The Firearm Training Guidelines are, of course, only one of many such regulations expected to be issued by SBI that are subject to APA review. SBI has, for example, not indicated to date how exactly it determines who meets its vague "dangerousness" standard such that a permit will be denied to the so-called dangerous applicant.

between now and November 16, the cap on non-exempt Delawarean permits is between 50-60 individuals.

Conversely, 40,686 NICS firearm background checks have been conducted to-date in 2025 in the State of Delaware. 53,370 such checks were conducted in 2024, and 50,080 were conducted in 2023. *Id*. at 20. Given that handguns are the most popular weapon chosen by Americans for self-defense, and are considered the "quintessential self-defense weapon," it is reasonable to assume that the majority of the checks in Delaware relate to handgun purchases.

Therefore, with a cap of 50-60 available permits for non-exempt Delawareans and a demand of thousands of handguns per year, the Permit Bill's failed, incomplete implementation will restrict purchases of handgun in the state to a minute fraction of expected sales. The State's failure has amounted to an effective ban on handgun sales in Delaware. This is the Permit Bill's goal.

## IV. THE PERMIT BILL VIOLATES THE SECOND AMENDMENT AND CHALLENGERS ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Permit Bill Is Not Presumptively Constitutional

The Permit Bill is not consistent with the Nation's tradition of firearm regulation as *Bruen* requires. The State instead relies on dicta in a footnote instead of *Bruen's* holding. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022).

Nothing new is offered in the State's opposition. The only additional case the State cites is *Koons v. Attorney Gen. N.J.*, 2025 No. 23-1900, 2025 WL 2612055, at 43 (3d Cir. Sep. 10, 2025) (pending en banc review request), as amended (Sept. 17, 2025), but that case did not deal with permits to purchase handguns. *Bruen* did not adopt a separate test for permits to purchase, nor a presumption for permits to purchase.

### B. The State Provides No Evidence that the Permit Bill Fits Within the Nation's Historical Tradition of Firearm Regulation

The State argues that the United States has "a long history of requiring individuals to acquire *some type of permit to purchase a firearm*." Opp. at 17. (emphasis added). Not so.

The State does not provide a single historical law from the Founding Era that required a permit to purchase a common firearm. Instead it cites to anti-gun activist Saul Cornell's article on post-Reconstruction and early 20th Century public carry permitting schemes, and then makes a leap of faith to argue that because there have at times been "some type[s] of permit[s]" for public carry, the Permit Bill's permit to *purchase* does not violate the Second Amendment. That makes no sense and it fails the *Bruen* test. Rather, it is a failed attempt "to uphold [a] modern law that remotely resembles a historical analogue," which *Bruen* warns, "risk[s] endorsing outliers that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30. The Permit Bill is one such outlier with no support in the Nation's historical tradition, evidenced by the State's failure to provide any relevant analogues. *See generally Watson v. Stone*, 4 So. 2d 700, 701 (Fla. 1941) (the main purpose of the permitting system created by 1893 Fla. Laws 71, 71-2 was to "disarm[] the negro laborers….[and that] the statute was never intended to be applied to the white population and in practice has never been so applied.")[7]

The State ignores any distinction between the Nation's traditions regarding public carry and that of possession in the home. The State's hired gun acknowledges in the article the State cites, that post-Reconstruction permit to carry schemes arose "particularly [because of] the danger posed

---

[7] The State omits any reference to Founding Era or early 19th Century permitting because the only laws that could conceivably qualify were racist. *See* Challengers' Complaint at 113-118. In fact, even the irrelevant 20th Century permitting law that the State cites in its opposition has racist motivations. 1893 Fla. Laws 71, 71-2, is cited prominently and approvingly by the State as an example of an early 20th Century permitting system.

by public carry," rather than general possession in defense of the home and family. Cornell at 75-76 (quoting unnamed delegate to the 1868 Texas Constitutional Convention).

Next, the State's approach still deliberately ignores the relevant era from which to derive the Nation's tradition of firearms regulation—the Founding Era.[8] *See, e.g., Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen* at 28, 37) (…the constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that 'meaning is fixed according to the understandings of those who ratified it[.]' *").*

**V. CHALLENGERS HAVE SHOWN IRREPARABLE HARM**

The State argues that the Challengers will not suffer irreparable harm because they now can apply for and get the required Permit. The attached Declarations, however, demonstrate the contrary position. They are not alone—the State admits it has only issued two "civilian" Permits. This effective handgun ban subjects FFLs to criminal prosecution and creates a risk of injury if a handgun is not available for self-defense.

The State maintains that this case is analogous to the remand decision in *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024). It is not. The State argues that the Third Circuit upheld the denial of preliminary relief in that matter "because the plaintiffs had not 'allege[d] a time sensitive need for such guns' and their 'generalized claim of harm is hardly enough to call for this 'extraordinary remedy.'" Opp. at 12. But the facts of the instant matter are materially different.

First, the State's argument ignores that plaintiffs in that case were relying on the presumption of irreparable harm and, as a result, only provided what the Court described "scant"

[8] The State mischaracterizes a quote from a law review article by Challengers' counsel in a misleading attempt to justify the training requirement. Opp. at 19 (quoting Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93, 99 (2022).

evidence of alleged harm. Challengers are not relying on a presumption. Second, Challengers have not made generalized claims of harm, but instead provided detailed declarations of the harms they will face as a result of an effective de facto handgun ban, e.g., loss of life as well as a "time-sensitive need" for firearms. *See, e.g.,* Neuberger 1st Decl. D.I. 6 ¶18-22 (asserting time-sensitive need to acquire a handgun for self-defense based upon age, criminal statistics, civil unrest and past threats of physical harm); *see also* the Decl. of Jeffrey Hague, D.I. 7, ¶ (stating that he has spoken to DSSA members who intend to buy a handgun on November 16, because "…[s]ome of these members do not presently own a handgun and some believe they cannot outrun or overpower a criminal if they or their loved ones would be attacked.") As for the Challengers who sell firearms, while economic loss may not always result in irreparable harm, the loss of one's business constitutes irreparable harm. *See, e.g., Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc*. 805 F.2d 351, 356 (10 Cir. 1986).

## VI. THE STATE'S ARGUMENT THAT AN INJUNCTION WOULD HARM THE PUBLIC SAFETY INTERESTS IS UNFOUNDED

The State argues that the balance of the equities tip in their favor because injunctive relief would (1) harm the State's public safety interest and (2) threaten the separation of powers by stalling the execution of its law. Opp. at 20. There is no record support for their position.

If the record is insufficient to quantify any harm to the public that would be caused by a preliminary injunction where government restrictions likely violate the Second Amendment, such restrictions should be preliminarily enjoined. *Koons v. Att'y Gen. New Jersey*, No. 23-1900, 2025 WL 2612055, at *43 (3d Cir. Sept. 10, 2025), as amended (Sept. 17, 2025) (remanding with instruction to preliminarily enjoin certain restrictions). So too here, there is no evidence of harm to the public from an injunction.

Respectfully submitted,

LEWIS BRISBOIS
BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*

Francis G.X. Pileggi (No. 2624)
Keith A. Walter (No. 4157)
Alexander D. MacMullan (*pro hac vice* admission pending)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Keith.Walter@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

*Counsel for Plaintiffs*

OF COUNSEL:
Joseph G.S. Greenlee
National Rifle Association of America – Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030

Dated: November 12, 2025